UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOLAMARIE WILSON,

    Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

    Defendant.

Case No. 14-cv-14741
Honorable Laurie J. Michelson
Magistrate Judge Mona K. Majzoub

**OPINION AND ORDER GRANTING HARTFORD LIFE'S MOTION FOR JUDGMENT [19] AND DENYING WILSON'S MOTION FOR JUDGMENT [20]**

Plaintiff Lolamarie Wilson asks this Court to review Defendant Hartford Life and Accident Insurance Company's decision to terminate her long-term disability benefits after finding she was no longer disabled within the meaning of the Policy. She also seeks review of Hartford Life's determination that her condition was pre-existing within the meaning of the Policy. Because Hartford Life's decision was not arbitrary and capricious, the Court will affirm the denial of benefits.

**I. BACKGROUND**

Lolamarie Wilson is a former Claims Analytical & Technical Consultant with The Auto Club Group. (R. 14-2, PID 499.) She participated in Auto Club's Group Long Term Disability Plan. (R. 18.) The Plan was insured by a Policy issued by Hartford Life. (R. 18, PID 830.) The Policy is incorporated into, and forms part of, the Plan. (R. 18, PID 830.) The Plan designates Auto Club as the employer/plan sponsor, and Hartford Life as the claims fiduciary with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (R. 18, PID 830.)

Under the Policy, long-term disability benefits are available to employees who are disabled. (R. 18, PID 810.) Benefits can be terminated as of "the date [the employee is] no longer disabled." (R. 18, PID 812.) Under the Policy, "Disability or Disabled means [the claimant] is prevented from performing one or more of the Essential Duties" of his or her job during the relevant time period. (R. 18, PID 818.) An "Essential Duty" is a duty that is "substantial, not incidental;" "fundamental or inherent to the occupation;" and "cannot be reasonably omitted or changed." (R. 18, PID 819.) Finally, the Plan provides, "Your Occupation means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." (R. 18, PID 821.) The Policy also contained a pre-existing condition limitation, which will be discussed in more detail later in this opinion. (R. 18, PID 814.)

As a Claims Analytical & Technical Consultant, Wilson's "essential duties" included "[r]eport preparation, database administration, submit and download mainframe jobs, gathering requirements, [and] business analysis." (R. 14-2, PID 468.) Her work schedule was eight hours per day, five days per week, with a half-hour minimum break. (R. 14-2, PID 468.) The job was "sedentary" and Wilson was "able to move about at will." (R. 14-2, PID 468.) The job allowed Wilson to "[a]lternate sitting and standing as needed[.]" (R. 14-2, PID 468.) The job "never" involved balancing, stooping, kneeling, crouching, crawling, climbing, or reaching above or shoulder or below waist level." (R. 14-2, PID 469.) The job setting was a "temperature controlled office environment." (R.14-2, PID 471.)

Wilson stopped work on May 15, 2012 due to lumbar radiculopathy. (R. 14-2, PID 518.) Lumbar radiculopathy's symptoms include "[p]ain that radiates through your buttocks and down your legs; worsens when standing or walking." (R. 14, PID 118.) Wilson was approved for short-

2

term disability benefits through October 21, 2012. (R. 14-2, PID 620.) In the meantime, Dr. Adam Schwaderer reviewed an MRI of Wilson's lumbar spine, which was taken on May 29, 2012. (R. 14, PID 107.) He identified a "synovial" cyst, measuring 7 x 7 mm, at the L4-5 vertebrae. (R. 14, PID 107–108.) The cyst "emanate[ed] from the right facet causing effacement of the right exiting nerve root." (R. 14, PID 107.) Schwaderer detected "mild acquired central canal stenosis secondary to narrowing of the right lateral recess" but "no disc herniation." (R. 14, PID 108.)

Dr. Samer Saqqa agreed with these conclusions when he saw Wilson for a follow-up appointment post-decompression of the cyst on July 31, 2012. (R. 14, PID 110.) Saqqa observed, "Examination shows patient to have good strength in both lower extremities. She has good range of motion in her knees and hips. Her incision is healing appropriately." (R. 14, PID 110.) Saqqa's treatment plan was continued use of a brace and Medrol Dosepak to improve radicular pain. (R. 14, PID 110.) He also ordered that Wilson "continue activity modifications with no bending lifting and twisting." (R. 14, PID 110.)

Saqqa saw Wilson for another follow-up on September 11, 2012. (R. 14, PID 111.) At that point, the cyst had been removed. (R. 14, PID 111.) Saqqa reported that Wilson had improved "about 50% better compared to before surgery." (R. 14, PID 111.) She was taking lower doses of Percocet than she had been immediately after surgery. (R. 14, PID 111.) "At this point I do believe that her symptoms will continue to improve," Saqqa reported. (R. 14, PID 111.) However, Saqqa recommended that Wilson find another job, because "the drive back and forth to her job location will aggravate and worsen her back and lower extremity pain." (R. 14, PID 111.)

On October 5, 2012, Hartford Life informed Wilson that she would have to apply for long-term disability benefits for benefits to continue after November 10, 2012. (R. 14-2, PID 620.) Shortly thereafter, on October 16, 2012, Wilson returned to Saqqa for another appointment. (R. 14, PID 112.) She reported continued radicular pain in the buttock and thigh. (R. 14, PID 112.) Saqqa concluded that "most likely her pain is related to chronic nerve damage." (R. 14, PID 112.) "At this point, she is a candidate for diagnostic and therapeutic right L5-S1 interlaminar ESI injection." (R. 14, PID 112.)

Wilson applied for long-term disability benefits on October 23, 2012. (R. 14-2, PID 456.) Hartford Life approved the benefits effective November 11, 2012 to December 14, 2012. (R. 14-2, PID 615.) The approval letter stated, "Benefit payments will continue, subject to Policy terms and limitations, as long as you meet the Policy definition and requirements . . . ." (R. 14-2, PID 615.)

On February 11, 2013, Dr. Timothy Piontkowski, Wilson's primary care provider, submitted an updated report. (R. 14-2, PID 712.) Piontkowski reported that Wilson was "[u]nable to sit properly in any chair" and could only occasionally (1 to 33% of the time) balance, stoop, kneel, reach, or crouch. (R. 14-2, PID 713.)

On March 15, 2013, Hartford Life advised Wilson that it had concluded that the Policy's Pre-Existing Condition Limitation applied to her claim, and "[c]onsequently the minimum benefit in the amount of $100.00 payable under the prior policy would be payable under the claim." (R. 14-2, PID 515.) The limitation applied, Hartford Life explained, because Wilson had been covered for less than 12 months before she left work on disability, had received treatment for lumbar radiculopathy during the three-month period prior to the effective date of her coverage under the Policy, and there was no consecutive three-month period in which she

4

received no treatment for the condition while she was covered under the Policy. (R. 14-2, PID 518.) This meant that "should [Wilson's] LTD benefit be reduced to the minimum amount," Hartford Life would pay "the minimum benefit . . . under the Prior Policy amount of $100." (R. 14-2, PID 518.)

As part of its ongoing review, Hartford Life conducted video surveillance of Wilson outside her home in May 2013. (R. 14-2, PID 715-16.) In the footage, Wilson was seen operating a riding lawnmower and "appeared to ambulate in a normal manner without observable bracing or support." (R. 14-2, PID 716.)

Due to perceived discrepancies between Piontkowski's report and Wilson's activities in the surveillance footage, Hartford Life scheduled an interview with her on June 11, 2013. (R. 14-2, PID 697.) Wilson reviewed the surveillance footage and confirmed that she was the person in the video. (R. 14-2, PID 697.) The interviewer observed that Wilson "did walk with a noticeable limp." (R. 14-2, PID 698.) Wilson stated that she had good days and bad days with regard to walking, was able to shop for herself, could stand but had problems standing for long periods, could carry light packages for short distances, and could slowly walk up and down stairs. (R. 14-2, PID 700.) She also stated that she could drive with "no problems," but that being seated in the vehicle for an hour or more would cause problems. (R. 14-2, PID 700.) But she stated that she would be in pain the entire ride. (R. 14, PID 99.) She could not squat or kneel. (R. 14-2, PID 700.)

On August 14, 2013, Hartford Life submitted to Piontkowski a request for clarification regarding "Wilson's current maximum level of function." (R. 14, PID 113.) Specifically, Hartford Life asked for Piontkowski's opinion

> as to whether Ms. Wilson currently has the functionality to perform activity as follows: 40 hours per week, primarily seated in nature, with occasional walking

>and standing and; allows for full use of the upper extremities. Lifting/carrying will be limited to 0-10 pounds on an occasional basis. Afforded will be the opportunity to change body positions/posture as needed for comfort (by walking, standing, or moving about).

(R. 14, PID 113.) Piontkowski answered, "Yes." (R. 14, PID 113.) However, he stated Wilson "may continue to have problems with long commutes and she may need to continue her medications." (R. 14, PID 113.)

>On August 29, 2013, Hartford Life wrote to Wilson:
>
>We have concluded from the combination of all the medical information in your file that you are able to work up to 40 hours per week in a sedentary occupation with the ability to change body positions/postures as needed for comfort, occasionally walking and standing, having no limitations in your upper extremities, and occasionally lifting and carrying 0-10 pounds. Based on this information, we have concluded that you are able to perform the Essential Duties as a Claims Analytical & Technical Consultant as of August 29, 2013.

(R. 14-2, PID 500.) In making this decision, Hartford Life reviewed Wilson's benefits questionnaire, Wilson's job description, correspondence and records from Piontkowski, records from the office of Dr. Jeffrey Harris, and the video surveillance footage. (R. 14-2, PID 499.) Hartford Life explained that Wilson's occupation was considered "sedentary" and that while her job required her to sit for the duration of the workday, she could move about at will and alternate sitting and standing as needed. (R. 14-2, PID 499.) Hartford Life explained that Piontkowski's original evaluation in February 2013 was inconsistent with the video surveillance footage conducted in May 2013, and as a result, Wilson was interviewed and a Hartford Life claims representative requested clarification from Piontkowski. (R. 14-2, PID 500.)

A week later, on September 6, 2013, Piontkowski sent a follow-up letter, stating, "Upon further review of the patient[']s medical record including surgical reports, orthopedic evaluations, MRI's, and physical therapy reports, as well as examination of the patient, the initial report I had sent is incorrect." (R. 14, PID 115.) "The correct answer based on a more complete

6

review should have been [']no['] and that the patient remains unable to work 40 hours per week in a position that would allow her to be primarily seated." (R. 14, PID 115.)

Wilson appealed the denial of long term benefits on November 14, 2013, apparently without the assistance of an attorney. (R. 14, PID 81.) On January 23, 2014, Hartford Life retained University Disability Consortium, a medical peer review company, to conduct a report in the areas of family medicine, cardiology, and orthopedics. (R. 14, PID 48.) None of the reviewing physicians met with or examined Wilson personally, but they did review her records and consult with one or more of Plaintiff's doctors, including primary care provider Dr. Piontkowski, orthopedic surgeon Dr. Saqqa, and cardiologist Dr. Harris. (R. 14, PID 48.)

Dr. James A.K. Lambur, orthopedist, reviewed Wilson's complaints regarding her orthopedic issues. (R. 14, PID 51.) Lambur concluded that "Wilson suffered from symptoms emanating from a mid-lumbar stenovial cyst which responded well to operative intervention and she is now well able to return to the work place 8 hours a day 40 hours a week at the light level of function." (R. 14, PID 59.) In making this determination, Lambur rejected Wilson's contention that her stenovial cyst was not a pre-existing condition because Wilson's degenerative joint disease as identified on May 29, 2012, which would have been a "contributing factor" to the cyst, must have been present prior to the diagnosis of the cyst. (R. 14, PID 61.) Lambur also disagreed with Piontkowski's August 2013 letter, in which Piontkowski stated that Wilson could not go back to work. (R. 14, PID 62.) He cited Dr. Saqqa's opinion that Wilson could start working again (though he did not mention Saqqa's comments regarding driving), as well as the fact that "[t]here is no evidence of ongoing rehabilitation efforts in order to increase this individual's functionality nor is there any evidence of ongoing necessity of chronic care being afforded her for ongoing complaints." (R. 14, PID 62–63.)

7

Dr. Phillip J. Podrid, a cardiologist, reviewed Wilson's file with a focus on her "cardiac status." (R. 14, PID 64.) Podrid stated that Wilson's cardiac history began on May 22, 2012, when she reported shortness of breath and underwent a cardiac nuclear perfusion scan . (R. 14, PID 65.) This exam revealed a "small defect of the inferoseptal and inferolateral walls." (R. 14, PID 65.) Wilson's cardiologist felt that this could represent "a stenosis of either the right or left circumflex coronary artery." (R. 14, PID 65.) However, both Wilson's physical exam and her cardiac catheterization were normal; therefore, concluded Podrid, "there are no cardiac abnormalities present." (R. 14, PID 66.) Podrid concluded that there was no indication that Wilson had any cardiac disease or problem that would prevent her from returning to work on a full time basis. (R. 14, PID 67.)

Georgette Chekiri, family medicine, conducted a general review of Wilson's file as to her restrictions and limitations. (R. 14, PID 68.) Chekiri concluded that Wilson "demonstrates the ability to perform skills that strongly suggests that she has residual functional capacity." (R. 14, PID 75.) Specifically, Chekiri rejected Wilson's contention that her medications made her too drowsy to return to work because "many people are able to proceed with their daily activities, including work, taking such a medication" and Wilson had "demonstrate[ed] the ability to operate heavy machinery, such as a lawnmower" and had continued to drive. (R. 14, PID 75.) The only restriction Chekiri recommended was that Wilson "not operate heavy machinery at the workplace" and "should not climb to heights in the workplace[.]" (R. 14, PID 75.)

On February 7, 2014, Hartford Life wrote to Wilson informing her that it would uphold the denial of benefits and the findings regarding the pre-existing condition on appeal. (R. 14-2, PID 475.) As to the pre-existing condition, Hartford Life explained, "while you may not have been aware that you had a cyst on your back that was diagnosed [on] 5/29/12, the cyst had been

present prior to that as was evidenced by degenerative joint disease identified on the MRI of 5/29/12," and further, "in his note of 5/7/12 [Dr. Piontkowski] stated that you had had back pain for five months." (R. 14-2, PID 481.) As to the disability determination, Hartford Life cited the opinions of the reviewing physicians, Podrid, Lambur, and Chekiri, concluding that "you are capable of performing at the light level." (R. 14-2, PID 482.)

Wilson filed suit in this Court on December 16, 2014. (R. 1.) The parties have filed cross-motions for judgment on the administrative record. The motions are fully briefed and the matter is ready for disposition. After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motions. *See* E.D. Mich. LR 7.1(f)(2).

## II. STANDARD OF REVIEW

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[U]nder *Bruch*, application of the highly deferential arbitrary and capricious standard of review is appropriate only if the plan grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). The parties agree that arbitrary and capricious is the appropriate standard of review.

Under this standard, the Court will uphold Hartford Life's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* "Although that standard is deferential, it is not a rubber stamp for the administrator's determination." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006). "This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). On review, this Court considers only the evidence before the plan administrator at the time the employee's disability eligibility was determined. *Yeager*, 88 F.3d at 381.

### III. ANALYSIS

Based on Wilson's Complaint, it appeared that she was merely challenging Hartford Life's determination that she was not disabled as of August 29, 2013. However, Wilson's motion for judgment makes clear that she is also challenging the determination that her condition was pre-existing. Because Wilson exhausted both of these claims of error through the administrative appeals process, the Court will address both in turn.

#### A. Disability Determination

Wilson first takes issue with Hartford Life's rejection of Piontkowski's September 2013 letter stating that she could not return to work. However, "[n]othing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). "Reliance on other physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions." *Balmert v. Reliance Std. Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010).

Moreover, two of Wilson's treating doctors, Dr. Harris and Dr. Saqqa, and all three reviewing physicians, opined that she could return to light work. Dr. Saqqa advised Dr. Lambur that he "concurred . . . that [Wilson was] able to return to the work place 8 hours a day/40 hours per week, 5 days a week." (R.14-2, PID 479.) Dr. Harris told Dr. Lambur that "there was no contraindication" to Wilson's ability to return to the workplace. (R. 14-2, PID 479.) Dr. Lambur himself opined that the "clinical material reviewed" did not support a finding of "dramatic dimunition [sic] of functions" because post-surgery MRIs were "within normal limits" without evidence of neurologic deficit or diminution in range of motion. (R. 14-2, PID 481.) He also disagreed with Dr. Saqqa's assessment of possible chronic nerve damage due to these MRI results and because observations of chronic nerve damage are "not necessarily validated with only ongoing complaints of discomfort volunteered by the individual to support that diagnosis." (R. 14, PID 56.) Dr. Chekiri also agreed with these conclusions, and added that based on her review, purported side effects from Wilson's medications would not preclude a return to work. (R. 14, PID 75.) Dr. Podrid added his opinion that Wilson's cardiac issues would not limit or restrict her activities such that she could not return to work. (R. 14, PID 67.)

Wilson next points out that Lambur, Chekiri, and Podrid merely conducted file reviews and never saw her in person. This is not disputed. Contrary to Wilson's argument that Hartford Life omitted the fact that Lambur, Podrid, and Chekiri merely conducted file reviews, all of the reviewers disclosed in their reports that they had not personally examined Wilson. (R. 14, PID 51, 64, 68.) There is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," but it is a factor for the Court to consider in determining whether Hartford Life's decision was arbitrary and capricious. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). In this case, each physician reviewed Wilson's

11

<023>

entire file as it was relevant to the determinations they were being asked to make. They also consulted with Wilson's treating doctors.

Lambur listed all of the documents he reviewed, which included clinical notes, laboratory studies, medications, and scans from September 2012 through September 2013. (R. 14, PID 53.) He also contacted Wilson's treating physicians and reviewed their restrictions and reports. (R. 14, PID 53–55.) Lambur stated that he disagreed with Piontkowski's September 2013 report because "[t]here is no residual evidence of radiculopathy emanating from the lumbar spine as a result of [the] stenovial cyst removal," and there was no evidence of "ongoing necessity of chronic care[.]" (R. 14, PID 63.) He based this conclusion on the results of several objective tests: Wilson's November 2012 MRI and May 2012 x-ray. (R. 14, PID 56.)

Similarly, Podrid reviewed office notes and test results from Dr. Harris, Wilson's attending cardiologist, and spoke with Dr. Harris on the phone. (R. 14, PID 64.) Podrid agreed with Harris' assessment that Wilson's cardiac issues would not preclude full-time work. (R. 14, PID 67.) And given that Podrid was retained specifically to opine on Wilson's cardiac status, his deferral to Chekiri and Lambur on the lumbar radiculopathy issue was reasonable. (R. 14, PID 64.)

Chekiri reviewed Wilson's prescriptions, physical therapy reports, medical history forms, the video surveillance, "all clinical data" available, and notes from Wilson's treating doctors between May 2012 and September 2013. (R. 14, PID 69.) Chekiri also spoke with Piontkowski, who stated that he thought Wilson could not return to work "due to her pain complaints." (R. 14, PID 73.) Chekiri also reviewed the notations Wilson had made on the report from her June 2013 interview. (R. 14, PID 72.) Although Chekiri did not directly address Piontkowski's comments regarding Wilson's pain level, she did opine that Wilson's pain medications would not preclude

12

a return to work because Wilson had demonstrated that she could drive, operate a riding lawnmower, and formulate a coherent appeal letter despite taking those medications. (R. 14, PID 75.)

Overall, the Court has no reason to doubt that each reviewer conducted a thorough review of Wilson's file, including objective data such as scans and laboratory test results, and did not rely on credibility determinations in making their assessments. *See Curry v. Eaton Corp.*, 400 F. App'x 51, 60 (6th Cir. 2010) (instructing that while a plan administrator cannot "simply ignore" treating physicians' opinions, it "can resolve conflicts between those opinions and the opinions of its own file reviewers if it provides reasons—including a lack of objective evidence—for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review[.]"); *cf. Calvert*, 409 F.3d at 297 n.6 ("Where . . . the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate."). While Piontkowksi did change his assessment and opined in September 2013 that Wilson was unable to return to work based on a complete review of the file, he did not explain why the scans supported that conclusion. (R. 14, PID 115.) And Hartford Life chose to reject that conclusion based on Lambur's findings, which were "supported by objective medical evidence[.]" *See Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x 469, 473 (6th Cir. 2005). It was not unreasonable for Hartford Life to credit medical opinions that were supported by objective evidence over opinions supported mostly by Wilson's self-reported pain levels. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007).

Wilson also argues that Hartford Life's determination should be overturned because it is not consistent with the Social Security Administration's determination that Wilson was disabled.

13

However, that determination is not part of the administrative record; therefore, the Court cannot consider it. *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006) ("The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator."); *Raskin v. UNUM Provident Corp.*, 121 F. App'x 96, 101 (6th Cir. 2005) (declining to consider a Social Security Administration determination of disability where it was not part of the record before the administrator).

Finally, the Court does not agree that Hartford Life gave "contradicting reasons" for denying benefits because it found that Wilson's condition was preexisting before terminating her benefits. The Policy language makes clear that a finding that a condition was pre-existing can be consistent with a finding that a condition is disabling (or not disabling). The pre-existing condition limitation merely limits the dollar amount of benefits payable for a disabling condition; it does not demand that such a condition be found "not disabling" under the Policy. (R. 18, PID 809.) Here, Hartford Life did not refuse to pay benefits following its determination that the condition was pre-existing. Rather, it limited the minimum benefit to the amount available under the Prior Policy. (R. 14-2, PID 518; *see also* R.14-2, PID 617 (advising Wilson, "Your Policy contains a provision that states that, if you have been continuously insured for more than 365 days for Long Term Disability, you may be eligible for benefits under the lesser of the Monthly Benefit available under your company's prior carrier's Long Term Disability plan or under [] Hartford's plan.").)

Overall, the Court finds that Hartford Life's determination of disability was not arbitrary or capricious. In particular, Hartford Life properly relied upon the opinions of three file

14

reviewers and two of Wilson's own doctors (Saqqa and Harris) to conclude that the objective evidence in Wilson's file did not support a finding of disability.

### B. Pre-Existing Condition Determination

Wilson also takes issue with Hartford Life's determination that her disabling condition was "pre-existing" as that term is defined in the Policy. The Policy provides,

> We will not pay any benefit, or any increase in benefits, under The Policy for any Disability that results from, or is caused or contributed to by, a Pre-existing Condition, unless, at the time You become Disabled:
>
> 1) You have not received Medical Care for the condition for 90 consecutive day(s) while insured under The Policy; or
>
> 2) You have been continuously insured under The Policy for 365 consecutive day(s).

(R. 18, PID 814.) The Policy defines Pre-existing Condition as

> 1) any accidental bodily injury, sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
>
> 2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, Mental Illness, pregnancy, or Substance Abuse;
>
> for which You received Medical Care during the 90 day(s) period that ends the day before:
>
> 1) Your effective date of coverage; or
>
> 2) the effective date of a Change in Coverage.

(R. 18, PID 814.)

Hartford Life explained that Wilson became covered under Auto Club's Prior Policy on January 1, 2009 and became covered under the Policy on January 1, 2012. (R. 14-2, PID 517.) Wilson stopped working on May 22, 2012, at which point she had been covered by the Policy for less than five months. (R. 14-2, PID 517.) Hartford Life also determined that she received

15

medical treatment for her disabling condition during the three months prior to the Policy's effective date. (R. 14-2, PID 518.) Specifically, Wilson had filled a prescription for Gabepentin, a drug Piontkowksi said he had prescribed for her back condition, on September 21, 2001; December 21, 2011; and March 7, 2012. (R. 14-2, PID 517.) Finally, Hartford Life concluded that there was no consecutive three-month period while she was insured where she received no treatment for the disabling condition. (R. 14-2, PID 518.) On appeal, Hartford Life explained that as of May 7, 2012, Wilson reported that she had experienced back pain for five months. (R. 14-2, PID 481.) Piontkowski also reported to Lambur that he ordered Motrin for Wilson in 2011 and 2012 because of her complaints of back pain. (R. 14-2, PID 482.)

The Court notes that the parties appear to have a different concept of which condition is at issue as being "pre-existing." While Hartford Life discusses the more general issue of Wilson's "back condition," Wilson focuses only on her stenovial cyst. However, Wilson applied for disability benefits not based on the stenovial cyst, which had not yet been diagnosed, but because of her reported lumbar radiculopathy. (R. 14-2, PID 784.) And all of Hartford Life's correspondence regarding the pre-existing condition refers more generally to Wilson's back pain.

Wilson says that Hartford Life's determination that her back pain was pre-existing was arbitrary and capricious because "[a]bsolutely no evidence points to when the synovial [*sic*] cyst actually appeared[.]" (R. 20, PID 907.) However, Wilson's disabling condition was not merely the presence of a stenovial cyst—the condition for which Wilson ceased working was "lumbar radiculopathy." (R. 14-2, PID 518.)

Furthermore, Lambur noted in his report that Wilson's "degenerative joint disease" was a "contributing factor" to the cyst, and he opined that the disease had been present prior to the Policy going into effect. (R. 14, PID 69.) Wilson argues, without citing to the record, that her

16

doctors found that her pain "was likely not caused by the cyst and because of that, the pain continued after the cyst was removed." (R. 14, PID 70.) First, this assertion is not supported by the record— Dr. Saqqa stated that the removal of the cyst, which was "likely causing neural impingement," resulted in "about 50% pain improvement since the surgery." (R. 14-1, PID 424.) And even if Wilson's assertion were supported by the record, it would seem to support Lambur's assessment.

In sum, there is evidence in the administrative record that Wilson's back condition and associated pain existed before January 1, 2012. Accordingly, the determination that the condition was pre-existing was not arbitrary or capricious.

## IV. CONCLUSION

On this record, the Court finds that Hartford Life's determinations that Wilson's condition was pre-existing and not disabling as of August 2013 were not arbitrary or capricious. The determinations are not mutually exclusive, and Hartford Life cited objective medical evidence—scans, lab tests, and prescriptions—in support of both. Therefore, Hartford Life's motion for judgment on the administrative record (R. 19) will be GRANTED and Wilson's motion for judgment on the administrative record (R. 20) will be DENIED.

> s/Laurie J. Michelson
> LAURIE J. MICHELSON
> UNITED STATES DISTRICT JUDGE

Dated: August 31, 2016

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 31, 2016.

> s/Jane Johnson
> Case Manager to
> Honorable Laurie J. Michelson